**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
───────────────────────────────────────

SHANE FRANCIS,

                              Plaintiff,

        vs.                                                    1:22-cv-783
                                                               (ECC/ML)
CITY OF ALBANY, CITY OF ALBANY
POLICE DEPARTMENT, CITY OF
ALBANY POLICE OFFICER JESSE MALL,
CITY OF ALBANY POLICE DETECTIVE
JOHN REGAN, CITY OF ALBANY POLICE
DETECTIVE MICHAEL FARGIONE,
CITY OF ALBANY POLICE DETECTIVE
MARK DIBBLE, CITY OF ALBANY POLICE
DETECTIVE SERGEANT JAMES WOOD
and JOHN DOES 1-10, individually and in
their official capacities,

                              Defendants.
───────────────────────────────────────

**Appearances:**

Alishah E. Bhimani, Esq., *for Plaintiff*
Abigail W. Rehfuss, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

        Plaintiff Shane Francis filed this action pursuant to 42 U.S.C. § 1983 asserting violations

of his Fourth and Fourteenth Amendment rights[1] arising out of his detention on February 2, 2022

in Albany, New York.  Presently before the Court is a motion for summary judgment, Dkt. No.

43, by Defendants the City of Albany, Albany Police Department Officer Jesse Mall, and Albany

───────────────

[1] Plaintiff withdrew his Fifth Amendment due process claim because the defendants are not federal
actors.  Dkt. No. 47-1 at 27.

Police Department Detectives John Regan, Michael Fargione, Mark Dibble, and James Wood (collectively, the Officers), and Plaintiff's cross-motion for partial summary judgment, Dkt. No. 47. A motion hearing was held on May 14, 2025. The motions are now fully briefed. Dkt. Nos. 43-1, 47-1, 51, 54, 55. For the following reasons, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied.

## I.    BACKGROUND[2]

Between June 2021 and February 2022, the Albany Police Department (APD) investigated Rickardo Smith for a "narcotics and firearm distribution enterprise." Def. SUMF ¶ 1. APD received information that Smith was selling "significant quantities of firearms from different locations within the City of Albany," and receiving cocaine from higher level sources of supply, who were "of Jamaican descent." *Id.* at ¶¶ 2,3; *see* Ex. A to Rehfuss Aff. (Search Warrants) at 5–7, Dkt. No. 43-4. APD also received information that one of Smith's sources "was a Black male, approximately 30 years old, average height and heavy set." Def. SUMF ¶ 4.

During the investigation, APD conducted four controlled buys from Smith, involving "over 130 grams of cocaine and a semiautomatic handgun." Def. SUMF ¶¶ 5, 6. On February 2, 2022, an Albany City Court judge issued search warrants for Smith's home, and three other properties that Smith owned in Albany. *Id.* at ¶ 7; Search Warrants at 1, 15, 33, 43.

The same day, the APD unit investigating Smith "conducted a surveillance operation . . . in an effort to locate Smith, take him into custody, and then execute search warrants" at his

---

[2] The following facts are drawn from Defendant's Statement of Material Facts (Def. SUMF), Dkt. No. 43-3, and Plaintiff's Statement of Material Facts (Pl. SUMF), Dkt. No. 47-3, to the extent those facts are well-supported by citations to the record, and the exhibits that the parties submitted to the extent that they reflect facts that may be admissible. Fed. R. Civ. P. 56(c). Citations to page numbers refer to pagination generated by the ECF system.

properties. Def. SUMF ¶ 8. Given the "dangerous nature of the weapons discovered during the course of the investigation," APD determined that "it would be best," for safety reasons, "to approach and apprehend Smith" outside of his home, and "decided to wait until he was in his vehicle to initiate a stop." *Id.* at ¶ 12.

After waiting several hours for Smith to leave, APD officers observed Plaintiff, a Black man, arrive at Smith's home. Def. SUMF ¶ 9; Pl. SUMF ¶ 4. According to Defendants, Plaintiff matched the physical description of Smith's supplier. Def. SUMF ¶¶ 16, 30. Plaintiff contends that he did not know that Smith was under investigation or that APD was preparing to search Smith's properties. Pl. SUMF ¶¶ 9,10. After Plaintiff attempted to reach Smith, Smith "eventually stuck his head out of the second-floor window, and made contact with" Plaintiff. Def. SUMF ¶ 10. Smith and Plaintiff "got into Smith's" truck, and Smith drove away. *Id.* at ¶ 11. The "police tailed it to an area away from Smith's address." Def. SUMF ¶ 11.

A few blocks away,[3] APD pulled over Smith's truck. Def. SUMF ¶ 13. In addition to a patrol vehicle, at least two unmarked vehicles participated in the stop, as well as one uniformed APD officer, Defendant Mall, and four plainclothes officers: Defendants Regan, Fargione, Dibble, and Wood. Ex. 2 to Bhimani Decl. (Dibble Video) at 5:00–5:06, Dkt. No. 47-6. The plainclothes officers wore bulletproof vests over their clothes, and at least two were visibly armed. Dibble Video at 4:56–5:00.

The Officers ordered Smith and Plaintiff to show their identification and then to get out of the truck. Ex. G to Rehfuss Aff (Mall Video) at 1:26–1:28, Dkt. No. 43-10; Ex. I to Rehfuss Aff.

---

[3] The Court takes judicial notice that 578 Clinton is a few blocks away from Smith's home at 148 Bradford according to Google Maps. Fed. R. Evid. 201(b)(2); *see S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead*, 624 F. Supp. 3d 261, 268 n.5 (E.D.N.Y. 2022); *see also Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 n.8 (2d Cir. 2022) (taking judicial notice of Google Maps).

(Regan Video) at 5:20–5:24, Dkt. No. 43-12.  During a conversation with the Officers, Plaintiff

explained that he was wearing a knee brace because of a recent medical procedure.  Dibble Video

at 0:53–1:02, 1:41–1:47.  Meanwhile, Defendant Mall checked Plaintiff's identifying information

using the computer in his patrol car.  Mall Video at 4:09–5:56.  Defendant Wood told Plaintiff that

Smith would be going to the station to talk to the police, and that Plaintiff would also have to go

to the station "for a little bit" because they "did not know his involvement."  Pl. SUMF ¶ 16.

Defendants Fargione and Regan placed Plaintiff in handcuffs, led him to the back of an unmarked

police vehicle, and drove him to the investigating unit's station.  Def. SUMF ¶¶ 15, 19.  During

the nine-minute car ride, Plaintiff stated that he grew up in Jamaica.  Regan Video at 11:05–11:08;

*see id.* at 10:46–19:46.

At the station, officers placed Plaintiff in an interview room where he was handcuffed and

shackled to a bench for approximately one hour and 50 minutes—"the time it took . . . to execute

the search warrants and secure" the search warrant locations.  Def. SUMF ¶¶ 32–33.  Plaintiff

described doing construction work for Smith at one of the search warrant locations.  Video from

Interview Room, Ex. H to Rehfuss Aff. at 0:00–1:19.

At each of the search warrant locations, "a couple members" of APD "were left behind"

after the location was "secured."  Def. SUMF ¶ 25.  After the locations had been secured, "a

determination was made to release [Plaintiff]."  *Id.* at ¶ 26.  Plaintiff was never charged with a

crime.  *Id.* at ¶ 27.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if

all the submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim") (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial."  *Anderson*, 477 U.S. at 248, 250; *see Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment,"  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles*

*v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Further, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  In addition, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "In short, courts should view 'the facts in the light depicted by the videotape.'" *Id.* (quoting *Scott*, 550 U.S. at 381).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (citation omitted).

## III.    DISCUSSION

Plaintiff alleges the following claims under § 1983: (1) false arrest and illegal imprisonment, (2) municipal liability pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), (3) violation of the Fourteenth Amendment's Equal Protection Clause, and (4) violation of the Fourteenth Amendment right to due process.  Dkt. No. 1 ¶¶ 81–100.

A.    **Defendants' Motion**

1.    **False Arrest**[4]

Defendants argue that the Officer Defendants had authority to detain Plaintiff under *Michigan v. Summers*, 452 U.S. 692 (1981) and that Plaintiff was only subject to a stop under *Terry v. Ohio*, 392 U.S. 1 (1968).[5]   Defendant's Memorandum of Law (Def. Mem.) at 5–9, Dkt. No. 43-1; Defendants Reply Memorandum (Def. Reply) at 4–8, Dkt. No. 51; Defendant's Supplemental Letter Brief (Def. Supp.) at 2, Dkt. No. 55.   Defendants also argue that the Officers are entitled to qualified immunity because there was arguable probable cause to arrest Plaintiff. Def. Mem. at 5–6, 9.   Plaintiff responds that the detention authority in *Summers* is limited under *Bailey v. United States*, 568 U.S. 186 (2013) to the immediate vicinity of a location to be searched, and that Plaintiff was subject to a de facto arrest after he was handcuffed and driven to the station. Plaintiff's Memorandum of Law (Pl. Mem.) at 12–17, 18–22, Dkt. No. 47-1.

To establish a § 1983 claim for false arrest, a plaintiff must demonstrate that: (1) "the [o]fficers intended to confine [him]," (2) he was "conscious of the confinement and did not consent to it," and (3) "the confinement was not otherwise privileged."   *Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (citing *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003)).   If the officers had probable cause for an arrest, or reasonable suspicion for an investigative detention, it is

---

[4] Plaintiff asserts false arrest and illegal imprisonment claims, but they are not distinct.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (noting that "[f]alse arrest and false imprisonment overlap; the former is a species of the latter").

[5] Defendants abandoned their argument that there was probable cause to arrest Plaintiff.  Hearing Tr. at 23 (defense counsel "didn't believe there was" probable cause in this case).  *See Gen. Ins. Co. of Am. v. Mezzacappa Bros.*, No. 1-cv-7394, 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003), *aff'd*, 110 Fed. Appx. 183 (2d Cir. 2004) ("Statements made by an attorney during oral argument . . . constitute binding judicial admissions.").

privileged.  *See Kee v. City of New York*, 12 F.4th 150, 158 (2d. Cir. 2021);  *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) (contemplating a § 1983 claim for an unreasonable investigative detention).

The first issue is whether *Summers* allowed the Officers to detain Plaintiff until the properties subject to the search warrants were secure.  Under *Summers*, officers executing a search warrant may "detain the occupants of the premises while a proper search is conducted."  452 U.S. at 705.  "Once an individual has left the immediate vicinity of a premises to be searched, however, detentions must be justified by some other rationale." *Bailey*, 568 U.S. at 202.  Here, Plaintiff was stopped away from the search warrant locations, and his detention must therefore "be justified by some other rationale."  *Id.*

Defendants attempt to distinguish *Bailey* because it involved the search of a single residence that had already been secured, while here there were four locations that had not been secured.  Hearing Tr. at 15–16.  This is not persuasive because the Supreme Court made clear that *Summers* detention authority is limited to the "immediate vicinity of a premises to be searched." *Bailey*, 568 U.S. at 202.  *Summers* therefore does not provide a justification for Plaintiff's detention.

The next question is whether there was a basis for a *Terry* stop.  It is well established that "a police officer may make a *Terry* stop 'as long as the officer has reasonable suspicion that the person to be detained is committing or has committed a criminal offense.'" *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017) (quoting *U.S. v. Compton,* 830 F.3d 55, 61 (2d Cir. 2016)).  "The standard for reasonable suspicion is 'not high,' and is less than what probable cause requires." *Grice*, 873 F.3d at 167 (quoting *U.S. v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)).  In addition, "whether an officer's suspicion is reasonable is an objective inquiry based on the totality of the

circumstances as they would appear through the eyes of a reasonable and cautious police officer, guided by his experience and training." *Id.* (citation omitted).

Even viewing the facts in the light most favorable to Plaintiff, there was reasonable suspicion to stop Plaintiff. The Officers saw Plaintiff make "several attempts to reach Smith" at Smith's residence, Smith "eventually stuck his head out of the second-floor window, and made contact with Plaintiff," and Plaintiff and Smith "eventually got into Smith's vehicle." Def. SUMF ¶¶ 9–11. In addition, the Officers had a search warrant for Smith's residence based on probable cause to search for evidence of illegal drug and firearm sales. Finally, the video evidence suggests that Plaintiff generally matched the description of Smith's supplier, but this "vague" description "would fit a very large group of ordinary . . . men" and is "assigned little to no value for [the] probable cause analysis." *United States v. LeFebvre*, 117 F.4th 471, 476 (2d Cir. 2024). Considering the totality of the circumstances, there was still a sufficient basis to stop Plaintiff for an investigative detention. *See Bailey*, 743 at 335 (concluding that reasonable suspicion existed to stop suspects "whose race, sex, build, and hair were consistent with an informant's description" of a drug dealer, and "who were seen leaving the very premises where the reported drug sale took place and where police had probable cause to think that an easily transportable firearm used in the drug trafficking was then located."). In addition, the Officers had authority to detain Plaintiff as part of their stop of the car Smith was driving. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

The next question is whether the investigative stop became an arrest requiring probable cause. "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a de facto arrest that must be based on probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992). "In assessing whether the degree of restraint was too intrusive to be classified as an investigative detention," the Second Circuit has

"considered in general the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained." *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993) (citations omitted).  Particular factors weighing on these general principles include "the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." *Id.* (cleaned up).  A "stop is limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place." *Grice*, 873 F.3d at 167.  Ultimately, the "touchstone of a de facto arrest analysis is whether the officers conducting the stop used 'the least intrusive means reasonably available to effect their legitimate investigative purposes.'" *LeFebvre*, 117 F.4th at 475 (quoting *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004)).  In short, "officers may not seek to verify or dispel their reasonable suspicions of crime 'by means that approach the conditions of arrest.'" *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (quoting *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion)).

"Handcuffing is ordinarily not incident to a Terry stop[] and tends to show that a stop has ripened into an arrest." *Grice*, 873 F.3d at 167.  Transportation to a police station and holding a person at the station has also been considered to be a factor supporting a conclusion under the totality of the circumstances that a stop has become an arrest.  *See Dunaway v. New York*, 442 U.S. 200, 212, 216 (1979) (holding that arrest occurred where suspect was "taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room" and was "never informed that he was 'free to go'"); *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (per curiam) (concluding that arrest occurred where a "17-year-old boy was awakened in his bedroom at three in the morning by at least three police officers, one of whom stated 'we need to go and talk'" and then "taken out in handcuffs, without shoes, dressed only in his underwear in January, placed in a

patrol car, driven to the scene of a crime," and then to a police station, "where he was taken into an interrogation room and questioned"); *Simon v. City of N.Y.*, 893 F.3d 83, 100 (2d Cir. 2018) (noting that it is "beyond debate since [*Dunaway*] that securing someone's presence at a police station" through a reminder of a material witness warrant and orders to come with officers to the station even without display of badges, guns, or force "is equivalent to conducting a formal arrest"); *United States v. Ceballos*, 812 F.2d 42, 48 (2d Cir. 1987) (concluding that an arrest occurred where an agent came to the suspect's workplace and made a "request" that the suspect come to the station "for questioning," did not inform him that he could refuse, and denied the defendant's request to take his own car); *Royer*, 460 U.S. at 494, 504–05 (concluding that transfer to a police room 40 feet away from the initial encounter constituted an arrest). Here, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff's stop ripened into an arrest at some point before he was released because he was handcuffed, taken to the station, and held there in handcuffs and shackles for almost two hours.

Finally, an officer "is entitled to qualified immunity against a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014) (citation omitted). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (citation omitted).

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (citation omitted). Probable cause does not require that this "belief that a person has committed a crime be correct or more likely true than

false." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019) (citation omitted). "It requires only facts sufficient to establish the sort of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (citation omitted). "To determine whether an officer had probable cause for an arrest," courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)) (additional citations omitted). Probable cause "depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371.

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that there was not arguable probable cause to arrest at any point on February 2, 2022. The Officers were aware only that Plaintiff knew someone whom they had probable cause to suspect of illegal drug and firearm sales, that Plaintiff was familiar with locations they had probable cause to search related to the illegal drug and firearm sales, and that Plaintiff may have generally fit a "vague" description of a drug source that also "would fit a very large group of ordinary . . . men" and so "assigned little to no value for [the] probable cause analysis." *LeFebvre*, 117 F.4th at 476. A reasonable jury could conclude that this does not amount to arguable probable cause. Accordingly, the Officers are not entitled to qualified immunity on their motion for summary judgment. Therefore, Defendant's motion for summary judgment on the false arrest claim is denied.

### 2.    *Monell* Liability

Defendants seek summary judgment on Plaintiff's claim for municipal liability against the City of Albany[6] under *Monell*, 436 U.S. 658. Defendants argue that Plaintiff cannot establish the

---

[6] The Court sua sponte dismisses APD as an improper defendant. Where a "plaintiff names both the municipality and the department as defendants, courts routinely have dismissed the claims

existence of a municipal custom or policy.  Def. Mem. at 10–12; Def. Reply 9–10.  Plaintiff
responds that Defendant Wood's deposition testimony that he has taken non-suspects to stations
"numerous times" while executing search warrants during his career is sufficient.  Plaintiff further
argues that Albany failed to train APD personnel.[7]  Pl. Mem. at 23–25.

"To hold a municipality liable under § 1983 for the unconstitutional actions of its
employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom
that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Lucente v.
Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)  (cleaned up) (citing *Monell*, 436 U.S. at 690–
91).

"To establish a municipal policy, practice, or custom, a plaintiff must provide evidence of
(1) a formal policy endorsed by the municipality; (2) actions taken or decisions made by the
municipality's policymakers, which caused the alleged civil rights violation; (3) a practice so
widespread that it constitutes 'a custom or usage;' or (4) a failure by the municipality's
policymakers to properly train or supervise their subordinates."  *Beckwith v. City of Syracuse*, 642
F. Supp. 3d 283, 292–93 (N.D.N.Y. 2022) (citing *Green v. City of New York*, 465 F.3d 65, 80–82
(2d Cir. 2006)).  Here, Plaintiff claims that APD had a custom of detaining people offsite when
executing search warrants and that APD did not train for the law established in *Bailey*.

To establish a policy through a "'persistent and widespread' practice by a subordinate
municipal employee (or employees) other than a policymaker, the employee's unconstitutional
conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making

---

against the department."  *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 233 (N.D.N.Y. 2023) (citation
omitted).

[7] At the motion hearing, Plaintiff suggested that the scenario for which Albany insufficiently trains
is "detain[ing] someone off premises to be searched."  Hearing Tr. at 3.

officials.'"  *Lucente*, 980 F.3d at 297–98 (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)).  There must be "sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse."  *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012).  "It is only at that point that, although not expressly authorized, the unconstitutional conduct is so persistent and widespread that it can constitute a custom."  *Lucente*, 980 F.3d at 298.

Although the Second Circuit has not articulated a bright-line rule for the number of violations required to establish a policy or custom for *Monell* purposes, courts have found that evidence of only a handful of violations is not sufficient.  *See, e.g., Jones*, 691 F.3d at 85 (holding that evidence of two or three incidents of unlawful conduct falls "far short" of demonstrating policy or custom); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (four incidents insufficient); *McLennon v. City of New York*, 171 F. Supp. 3d 69, 96 (E.D.N.Y. 2016) (six incidents insufficient).  At some point on this spectrum, however, the number of incidents becomes cognizable.  *See, e.g., Davis v. City of New York*, 959 F. Supp. 2d 324, 335, 355 (S.D.N.Y. 2013) (reasonable for jury to find *Monell* liability when there was evidence of eight similar unconstitutional arrests).

Here, Plaintiff has presented sufficient evidence to give rise to a genuine issue of material fact as to whether the municipal Defendant had a practice of illegally detaining individuals incident to executing search warrants, so widespread that it constituted a "custom."  Namely, Plaintiff points to the following deposition testimony given by Defendant Wood:

> Q: Have you ever detained someone else who was not a suspect at the station while you were executing a search warrant on some properties in your career?
>
> * * *
>
> A: Numerous times.

Q: Can you identify any?

A: No. I can't recall.

Q: It happened so many [sic] you just can't recall?

A: I can't – I mean, no.  I mean, I have done it numerous times.  It would be impossible for me to remember a person or an event.

\* \* \*

Q: Was it your practice to detain the people that you would find with the target under those circumstances [similar to Smith's and Plaintiff's]?

A: No. In fact, we don't want to do that ever.  We, unfortunately, have to operate the way they operate.  That is not something we want to do.  We want our main target and we want it to be as easy as possible and move on with our business.

Q:  But you told me a minute ago there have been many times you've detained somebody like [Plaintiff] who is, for lack of a better term, a bystander, during a search warrant operation.   What was it about – what were some of those circumstances where that would happen?

A: Well, I can only speculate and give you this exact example where we are waiting on a violent offender to come out of his house, and he comes out with another person.  We have no choice but to now detain them because they may be involved or they could be destroying evidence or they could get hurt because they go back to the location while we are executing a search warrant.  These situations are outside of our control.  They are not something that we want to do.  In fact, I wish [Plaintiff] had never been there.  That way we could have just taken [Smith] and gone about our business.

Q: Right. But you said before it happens so many times you can't recall a specific time.

A: Well, not so many times.  It happens numerous times, and I can't go back in my mind and now remember particular incidents where it occurred.  You know, it doesn't strike my memory as important to recall that information.  I just couldn't tell you. But it has happened before, yes.

Dkt. No. 43-7 at 30:16–31:5, 32:17–34:9.   Based on this testimony, Plaintiff represents as

undisputed fact that "[i]t is standard practice for [D]efendants, while executing a search warrant

pursuant to a firearms investigation, to detain suspects away from the premises to be searched,"

and that "[i]f, at the time such suspect is stopped, the suspect is with another person, defendants'
practice is that such bystander is also placed into custody, without an individualized suspicion or
belief that he or she was engaged in criminal activity or probable cause for such person's arrest."
Pl. SUMF ¶¶ 43–44.

Defendants deny this fact to the extent that Plaintiff interprets "numerous times" as
displaying a "standard practice."  Def. Reply SUMF ¶¶ 43–44, Dkt. No. 51-1.  Defendants further
posit, without citation, that "[i]n firearms related offenses involving violent suspects, the police
endeavor to intercept suspects away from locations where firearms are believed to be for
operational safety reasons."  *Id.* at ¶ 43.  This is, however, irrelevant to the central question of the
Defendants' practice concerning "bystanders" to such operations.  Furthermore, Defendants do not
meaningfully dispute that the conduct as testified to by Defendant Wood is unconstitutional, *see*
the analysis of the false arrest claim above, nor do they deny that such measures occurred
"numerous times."

Viewing the evidence in the light most favorable to Plaintiff, the Court declines to grant
summary judgment as to this theory of Plaintiff's *Monell* claim.  Although the record could,
perhaps, be more robust as to the number of instances the Defendants engaged in the purportedly
unconstitutional practice, Plaintiff has satisfied his burden of raising a dispute regarding a material
fact as to whether the conduct was so "persistent and widespread," "so permanent and well settled
as to constitute a custom or usage with the force of law," and "so manifest as to imply the
constructive acquiescence of senior policy-making officials." *Sorlucco*, 971 F.2d at 870–71
(citations omitted).  Accordingly, Defendants' motion is denied as to this theory of *Monell* liability.
*See Davis*, 959 F. Supp. 2d 324, 355 (S.D.N.Y. Mar. 28, 2013) (concluding that fact issues
precluded district judge from granting defendant's motion for summary judgment on *Monell*

16

claim); *Media Alliance, Inc. v. Mirch*, 09-cv-0659 (MAD/RFT), 2011 WL 3328532 at *13 (N.D.N.Y. Aug. 2, 2011) (viewing the evidence in the light most favorable to plaintiffs, there was sufficient evidence from which a reasonable juror could conclude the defendant city had a practice that infringed on plaintiff's constitutional rights); *Tomaino v. Williams*, 05-cv-3916, 2007 WL 2743602 at *3 (E.D.N.Y. Sept. 18, 2007) (denying defendant town's motion for summary judgment on *Monell* claim because a reasonable juror could find that town had a custom of discrimination).

Defendants are, however, entitled to summary judgment on Plaintiff's *Monell* claim premised on failure to train.  To establish failure to train, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.'"  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). A plaintiff "must show that a [municipal] policymaker knows to a moral certainty that her employees will confront a given situation," and further "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."  *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (citation omitted).  Because of this high bar, a failure to train theory is where a "municipality's culpability for a deprivation of rights is at its most tenuous."  *Connick*, 563 U.S. at 61.

Here, Plaintiff has proffered no evidence of the municipality's training programs or advanced any theory as to how a training deficiency caused the officers to violate Plaintiff's constitutional rights.  Nor has he offered any evidence of purported inadequacies in the municipality's training program and the causal relationship between those inadequacies and the alleged constitutional violations.  "Plaintiffs have provided no evidence tending to rule out those

causes of the [unconstitutional conduct] that would not support municipal liability, such as the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training, and therefore no reasonable factfinder could conclude that the [underlying violations] occurred as a result of training deficiencies." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 (2d Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989)). Plaintiff's failure to train theory is based solely on evidence that the purportedly unconstitutional practice occurred in the first place, and not that no adequate training program existed. Pl. Mem. at 24–25. Because Plaintiff has failed to raise an inference that the officers were improperly trained and that this training caused them to illegally detain bystanders to search warrant operations, summary judgment is appropriate as to this theory of municipal liability.

### 3.  Equal Protection

Defendants seek summary judgment on Plaintiff's equal protection claim based on selective enforcement based on race, arguing that Plaintiff cannot identify any similarly situated comparators or racially motivated conduct by the Defendants.[8] Def. Mem. at 12–13; Def. Reply at 8–9. Plaintiff responds that "it is common practice for [APD] to falsely arrest a Black individual on the basis of race alone," pointing to complaints from various lawsuits against Albany and APD officers. Pl. Mem. at 25–27.

There are "two types of equal protection claims," intentional discrimination and selective enforcement. *Dixon v. City of Syracuse*, 493 F. Supp. 3d 30, 41–42 (N.D.N.Y. 2020). Plaintiff does not articulate which type of equal protection claim he asserts in his claim.

To establish an intentional discrimination claim, a plaintiff must (1) "point to a law or policy that expressly classifies persons on the basis of race," (2) "identify a facially neutral law or

---

[8] Plaintiff alleges a violation of equal protection solely on his race. Pl. Mem. at 25–27.

policy that has been applied in an intentionally discriminatory manner," or (3) "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999) (citations omitted).

Here, Plaintiff's argument that APD has a "common practice of falsely arresting [Black] individuals on the basis of race alone," relies on his request that the Court take judicial notice of several civil rights lawsuits filed against the City of Albany and APD members. Plaintiff's Supplemental Letter Brief (Pl. Supp.) at 4, Dkt. No. 54. "[C]ourts routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation." *Kramer v. Time Warner Inc*., 937 F.2d 767, 774 (2d Cir. 1991). The Court therefore cannot take judicial notice of the other lawsuits for the truth of the matters asserted in that litigation. Even if the Court could take judicial notice of the other lawsuits for the truth of the matter asserted, however, that would still not establish the existence of a relevant law or policy because none of the suits allege that APD detained or arrested a Black person away from a search warrant location. *See generally* Dkt. No. 47-10. Other than the lawsuits, Plaintiff has not produced any evidence of a law or policy that directly or indirectly classifies persons on race as required for his intentional discrimination claim. Therefore, even viewing the facts in the light most favorable to Plaintiff, he cannot establish an intentional discrimination claim.

To prevail on a selective enforcement claim, a plaintiff must establish that he was selectively treated compared with others similarly situated and that the selective treatment was impermissibly motivated. *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995). That is, he "must specify at least one instance in which he was treated differently from another similarly situated." *Hu v. City of New York*, 927 F.3d 81, 101 (2d Cir. 2019).

Plaintiff cannot establish a selective enforcement claim because he has not provided any evidence of a similarly situated comparator that would allow a reasonable jury to conclude that he suffered an equal protection violation. Defendants' motion for summary judgment is therefore granted as to his equal protection claim, and Plaintiff's cross-motion is denied.

### 4.    Due Process

Defendants seek summary judgment on Plaintiff's Fourteenth Amendment due process claim. [9] Defendants argue, among other things, that this claim is duplicative of Plaintiff's false arrest and *Monell* claims. Def. Reply at 10–11; Def. Supp. at 3. Plaintiff responds that his due process claim is not duplicative. Pl. Supp. at 1–3.

For substantive due process, "it is now well established that '[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.'" *Hu*, 927 F.3d at 104 (quoting *Southerland v. City of New York*, 680 F.3d 127, 142–43 (2d Cir. 2012). District courts across the Second Circuit have held that procedural due process claims based on false arrests are duplicative of such Fourth Amendment claims. *See Harris v. Binghamton Police Dep't*, No. 3:22-cv-977 (BKS/ML), 2023 WL 7319090, at *2 (N.D.N.Y. Nov. 7, 2023); *Levantino v. Skala*, 56 F. Supp. 3d 191, 203 (E.D.N.Y. 2014); *Bernhardt v. Cnty. of Erie*, No. 19-cv-1334, 2022 U.S. Dist. LEXIS 85461, *11 (W.D.N.Y. May 10, 2022) *report recommendation adopted* 2022 WL 14912615 (W.D.N.Y. Oct. 25, 2022). Here, Plaintiff's due process claims are duplicative of his false arrest claims because the Fourth Amendment provides an explicit textual source of constitutional protection for the deprivations of liberty presented by a

---

[9] Plaintiff initially alleged a violation of his Fifth Amendment rights but has now abandoned that claim. *See* Pl. Mem. at 27.

false arrest. Defendants' motion for summary judgment as to this claim is therefore granted, and Plaintiff's cross-motion is denied.

### B.    Plaintiff's Motion[10]

#### 1.    False Arrest

Plaintiff argues that summary judgment is appropriate because the undisputed facts establish that he was subject to a de facto arrest without probable cause. Pl. Mem. at 12–18. Defendants respond that handcuffing, transporting, then holding Plaintiff at the station was a legitimate means of confirming or dispelling reasonable suspicion, and that the Officer Defendants are protected by qualified immunity because there was arguable probable cause to arrest Plaintiff. Def. Mem. at 5–6, 9; Def. Reply at 4–8.

"It is well settled that to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

Even viewing the facts in the light most favorable to Defendants, a jury could find that Plaintiff's detention became an arrest at some point before he was released from the station, and, if a jury reached that conclusion, there is a genuine issue of material disputed fact about which Officers would be liable based on their personal involvement.

Moreover, viewing the facts in the light most favorable to Defendant, the Officers were aware that Plaintiff knew someone who they had probable cause to suspect of illegal drug and firearm sales, that Plaintiff was familiar with locations they had probable cause to search for evidence of the illegal drug and firearm sales, and that Plaintiff fit a description of a drug source.

---

[10] In light of the Court's previous findings, the analysis of Plaintiff's motion is limited to those claims that survived Defendants' motion for summary judgment.

As a result, a genuine issue of material disputed fact exists as to whether there was arguable probable cause, preventing the Court from making a finding of law on qualified immunity at this time. If the jury finds that any Officers are liable for a false arrest, then the qualified immunity argument can be renewed. Therefore, Plaintiff's cross-motion for summary judgment is denied as to this claim.

### 2.    *Monell* Liability

Plaintiff argues that judgment should be entered in his favor against the municipal defendant under *Monell* because of the custom of illegally detaining bystanders away from premises in which a search warrant is being executed. Pl. Mem. at 23–24. As previously discussed, the Court finds that a question of fact remains as to whether Plaintiff suffered a constitutional injury as a result of conduct that was so widespread and pervasive as to permit an inference of municipal liability. Accordingly, Plaintiff's cross-motion for summary judgment is denied as to this claim.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's cross-motion for summary judgment pursuant to Rule 56, Dkt. No. 47, is **DENIED**; and it is further

**ORDERED** that Defendants' motion for summary judgment pursuant to Rule 56, Dkt. No. 43, is **GRANTED IN PART** and **DENIED IN PART;** and it is further

**ORDERED** that Defendants' motion is **DENIED** as to Plaintiff's claims for (1) false arrest and (2) municipal liability pursuant to *Monell* on the theory of a custom; and it is further

**ORDERED** that Defendants' motion is otherwise **GRANTED**; and it is further

**ORDERED** that the City of Albany Police Department is sua sponte dismissed as an improper defendant; and it is further

**ORDERED** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

Dated: September 30, 2025

Elizabeth C. Coombe
U.S. District Judge